No. 29,774.

WILLIAM S. DENNIS, *Appellee*, v. THE KANSAS CITY, KAW VALLEY & WESTERN RAILWAY COMPANY, *Appellant*.

(299 Pac. 941.)

Opinion filed June 6, 1931.

*J. E. McFadden* and *O. Q. Claflin, Jr.,* both of Kansas City, for the appellant.

*Arthur J. Mellott* and *George E. Gard,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action for damages to plaintiff's truck which was struck by a freight train on defendant's interurban railway a mile or two west of Kansas City.

The *locus in quo* was as follows: North of the Kaw river, which flows eastwardly thereabout, lie the tracks of the Union Pacific railway. North of the Union Pacific tracks is a bluff which parallels the river and the railway. On the side of the bluff about twenty feet higher than the Union Pacific tracks is a natural shelf upon which there is a narrow roadway known as the "old Muncie road." Immediately north of this old roadway lies the interurban track of the Kansas City, Kaw Valley & Western Railway Company, defendant in this action. A short distance north of defendant's interurban line and on a still higher level a new public highway was being constructed at the time of the incident of present concern.

East of the place where the collision occurred the new road was so far completed that it was used for traffic. At that point westbound traffic on that new road veered to the south across the defendant's railway and turned sharply to the right on the old Muncie road. There was no regular railway crossing at this point, but there was a "well-defined and well-beaten roadway up to and across the tracks of the defendant" which had existed for several months notwithstanding defendant had made repeated efforts to stop it. Immediately west of this irregular crossing, on the north side of the track, there was situated a rock crusher with bins and machinery in an edifice 40 by 50 feet in area and 25 or 30 feet high.

On the afternoon of May 8, 1929, plaintiff came from the east driving a 2½-ton truck loaded with fifty sacks of cement. He left the new road under construction and turned south to cross defendant's railway, intending to proceed westward on the old Muncie road. That road is so narrow at that place that plaintiff's truck could not be driven directly across defendant's railway and then turned westward without danger of toppling over the shelflike embankment down to the Union Pacific tracks below. It was necessary for plaintiff to negotiate defendant's railway track at an angle and to see-saw back and forth several times. While plaintiff was thus engaged defendant's freight train, consisting of six carloads of sand drawn by an electric locomotive, came from the west and demolished plaintiff's truck.

Plaintiff's petition charged negligence in various particulars.

Defendant's demurrer thereto was overruled, and it answered with a general denial, and alleged that plaintiff's damages were the direct and proximate result of his own negligence in driving his truck on the railway track without proper regard or caution.

On this joinder of issues the cause was tried before a jury. Plaintiff testified that the rock crusher was located about ten feet north of defendant's railway track and that he had been there several times—

"It is a pretty fair crossing but a short turn there for a large truck to the west. . . .

"I came down this steep grade east of the rock crusher and I could not quite make the turn there and I had to back up once before I turned south. . . .

"Q. Now, if you had continued on south what would have happened? A. I would have went over the bank there about twenty feet deep.

"Q. How far south did you go then? A. I went as far as the car tracks and crossed to turn the front wheels over the south rail.

"Q. Then what did you do? . . . A. Then I stopped very still there.

"Q. Now we have got you stopped on the track, now what did you do after having stopped? A. I backed up to get cater-cornered.

"A. I pulled up again on the north tracks and stopped, the left front wheel over the south rail.

"Q. What did you do again? A. I backed up again.

"Q. Now after you started and stopped twice, and having backed up a couple of times, where were you when you backed up after you had backed up this second and third time, whatever it was? . . . A. . . . I pulled back onto the track before the collision and then I backed off and pulled back on the track again. At that time I had the truck on the track and I was going to put something on the track so I could go northwest. And just as I got out on the track I seen the switch engine coming and I tried to reverse and get back off the track, and I seen I couldn't back it and by that time they struck me.

"Q. From your position in the cab, at the time that the front end of your car was on the north rail of the track, after you had backed up the second or third time, from your position in the cab could you see south and west down the track as you could if you had been up in the center of the track? A. No, sir, I couldn't.

"Q. Why not? A. The rock crusher sitting on the west and between me and the view of the west.

"Q. You didn't go forward on these tracks and didn't see if a train was coming? A. No, sir.

"Q. How long would it take you to back up after you switched your gears? A. O, I don't know, probably half a minute or a minute.

"Q. You stopped your car on the railroad track? A. Yes, sir.

"Q. And the purpose of building the roadway for yourself with rocks and boards was so you could go on? A. Yes, sir.

"Q. Did you have any rocks or boards on your car? A. I didn't have any on the car; no, sir. There were plenty around there.

"Q. You had to get out of the seat to get the rocks and boards to fill that up and build your roadway and go on? A. Yes, sir.

"Q. And before you could do that, what happened? A. I looked up and see this switch engine coming.

"Q. So now in those three operations from the time you first passed the east side of that crusher and got out on the track the first time you had completed these changings, backing the three times and pulling forward and stopping, and stopped for the purpose of building a way so you could get off the track, tell the jury how long a time elapsed. A. Really I don't know. Probably four or five minutes. I don't know. I didn't pay any attention to that.

"Q. Then you knew when you went up on there the third time in the position you had your car, that you couldn't drive over the crossing without stopping to put something—put rocks or boards or something on the south side of the track so it would let you down without breaking a spring? A. Yes, sir; I seen that.

"Q. You stopped on the track that third time you went upon the track, to get out, as you testified yesterday, to put the boards or rocks in front of your car? A. I would if the switch engine had not been coming.

"Q. Exactly. That was your purpose in stopping there. A. Oh, yes, sir.

"Q. Then before you got past the rock crusher your vision was obstructed, wasn't it? A. Yes, sir, it was."

Defendant's demurrer to plaintiff's evidence was overruled, and witnesses called by the railway company testified as to the circumstances, the condition of the crossing, the location of the crusher and the efforts of plaintiff to get his large truck across the railway track by moving it back and forth at suitable angles. One eyewitness testified:

"His truck teetered back and forth on the track. . . . After the second backing it completely stopped and then went forward again. . . . Then when it started forward it proceeded about as far as it did the first time. . . . Then it was brought to a stop again. I think the train was pretty well on it at that time. . . . I looked at the truck pretty much. The train was coming from that way and the object was to see what was going to happen. Mr. Dennis' truck was on the crossing, the bell was ringing and I knew something was going to happen.

"Q. Can you give this jury any idea in seconds or minutes of the length

of time that elapsed from the time that Mr. Dennis' truck first went on to the track, the length of time that it took that truck to make—to run across the track, be shifted into reverse and to back up, and then he shifted into a forward speed and go forwards, and be shifted in another reverse and go back, and be shifted into another and go forward again—can you give the jury any idea as to the length of time that elapsed while that was taking place?

"A. Well, I didn't keep the time. I judge it was more than ten seconds; yes, sir. I don't believe it was more than two or three minutes. I don't think it was that long. I will split the difference with you and say one minute and a half. I don't know whether there had been as much as a minute and a half elapsed from the time I first heard the whistle and the bell until I heard the collision."

The train conductor who had been riding in front of the electric locomotive with the engine man testified that he first noticed plaintiff's truck when the engine was 100 feet west of it; that the train was running at twelve to fifteen miles per hour; that the emergency air brake was applied, which slowed down the train to two miles an hour when the collision occurred. He also testified that there was nothing to obstruct a view of an object on the crossing from a distance of 500 feet west if the object was on the crossing. The testimony of the motorman who operated the locomotive was much to the same effect. Defendant's railway superintendent testified as to his orders and efforts to prevent or terminate the semblance of a crossing at the place of collision.

The jury returned a verdict of $937.50 in favor of plaintiff as damages for the demolition of his truck and for loss of earnings, and made a number of special findings, some of which read:

"3. Was the place where the plaintiff attempted to cross the track of the defendant a public highway established by the state, county or township? A. No.

"3a. If you answer question No. 3 in the negative, state whether or not at said place there was a well-defined or well-beaten roadway up to and across the tracks of the defendant. A. Yes.

"5. Did the engineer and conductor in charge of defendant's train exercise ordinary care in approaching the place where the accident occurred? A. No.

"6. If you answer the last above question 'No,' then state specifically and definitely in what manner and in what particular they or either of them failed to exercise ordinary care. A. Was not watching close enough and failed to apply brakes soon enough.

"7. What distance west of the point of collision was the train when the engineer first saw plaintiff's truck approaching the railroad track? A. Sixty feet.

"7a. How long was the plaintiff's truck on the tracks of the defendant immediately prior to the collision? A. One and one-half minutes.

"7b. What, if anything, prevented the operator of the engine from seeing plaintiff's truck upon the track during the period of time that you find from the preceding question said truck was on the track, prior to the collision? A. Nothing.

"8. Did the engineer of said train do everything he reasonably could do to avoid striking plaintiff's truck after he discovered the truck in a position of danger? A. Yes.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"10. If the plaintiff had looked toward the west before starting his truck forward across the track the last time, how far could he have seen the approaching train? A. From 400 to 500 feet.

"11. Could the plaintiff by keeping a vigilant lookout while negotiating the position of his truck on the track have seen the train approaching from the west before it got within thirty-five or forty feet of him? A. Yes."

Judgment for plaintiff was entered on the verdict and special findings. Defendant assigns and argues various errors, some of which may require no attention.

The jury's finding No. 6 was that defendant's negligence lay in the fact that its employees were "not watching close enough and failed to apply brakes soon enough." That finding acquitted defendant of all other negligence charged in the petition. (*Williams v. Railway Co.*, 100 Kan. 336, 164 Pac. 260; *Morlan v. Atchison, T. & S. F. Rly. Co.*, 118 Kan. 713, 236 Pac. 821.) The special findings bind plaintiff and defendant alike, where they are supported by competent evidence; and here the plaintiff, at least, does not complain of them. Finding No. 10 shows that if plaintiff had looked toward the west before starting his truck across the track the third time he could have seen the approaching train when it was 400 or 500 feet away. When plaintiff drove his truck on the railway track he took no effective precaution to assure himself that no train was coming within the time it would take him to negotiate the crossing by see-sawing at an angle back and forth. Moreover, he knew he would have to stop on the track until he could pick up boards and rocks to lay against the rails to make a runway to steer the truck diagonally across the railway track so that it could proceed westward on the old Muncie road. Even if the crossing had been a regularly established one, the duty would have rested on plaintiff to assure himself that no train was coming so near at hand that it would be dangerous to undertake to cross ahead of it. It was the sheerest sort of negligence for plaintiff to undertake to negotiate that irregular railway crossing without regard to the possibility of a train's approach. While plaintiff testified that he looked and lis-

tened for a train and neither heard nor saw it until it was almost upon him, his own testimony also was that because of the noise of the stone crusher he could not hear, and because the building housing the crusher cut off his view, he could not see, at the only time it would have done any good to look—immediately before driving on the track. And it was likewise negligence to drive on such a crossing with a heavy vehicle—five tons as loaded, knowing the necessary and complicated maneuvers it would take to accomplish it, and that he would have to let the truck sit on the track while he would get out of the cab and gather materials on the ground thereabout to make a runway. (*Malott v. Railroad Co.*, 99 Kan. 115, 160 Pac. 978; *Allen v. Railway Co.*, 104 Kan. 23, 178 Pac. 395.) The special findings and the plaintiff's own testimony convicted him of contributory negligence, and judgment in favor of defendant should have been entered either on demurrer to plaintiff's evidence or on the special findings, or on both.

This case does not differ in principle from many other railway-crossing cases where damages had to be withheld because of plaintiff's contributory negligence notwithstanding the negligence of the railway company. (*Wehe v. Railway Co.*, 97 Kan. 794, 156 Pac. 742, and citations; *Clark v. Atchison, T. & S. F. Rly. Co.*, 127 Kan. 1, 5, 272 Pac. 128; Anno., Railroad Crossing, Contributory Negligence, 56 A. L. R. 647, *et seq.*)

The theory of "last clear chance" was projected into the case at the trial and is reflected in the court's instructions, but the special findings of the jury made it clear that there was neither time nor opportunity in this case for the application of that rule of law. (*Jamison v. Atchison, T. & S. F. Rly. Co.*, 122 Kan. 305, 252 Pac. 472; *Dearing v. Wichita Rld. & Light Co.*, 130 Kan. 142, 285 Pac. 621.)

The judgment of the district court is reversed and the cause remanded with instructions to enter judgment for defendant.